# APPENDIX TO THE MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## PART 2 OF 2

FILED
DES MOINES, IOWA

97 FEB 12 AM 11: 42

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
DAVENPORT DIVISION

|  |  |  |
|---|---|---|
| UNIVERSITY OF IOWA HOSPITALS AND CLINICS, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | CIVIL NO.  3-96-CV-10012 |
| DONNA E. SHALALA, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES | ) ) ) ) ) | |
| Defendant. | ) ) | ORDER |

The Court has before it Plaintiff University of Iowa
Hospital and Clinics' ("UIHC") Motion for Summary Judgment filed
July 19, 1996.  Defendant Donna E. Shalala, Secretary of the
Department of Health and Human Services ("the Secretary") filed a
Motion for Summary Judgment on September 9, 1996.  UIHC filed a
resistance to the Secretary's Motion for Summary Judgment and a
reply to the Secretary's opposition to UIHC's motion on October
4, 1996.  The Secretary filed a response on October 18, 1996.

I.   BACKGROUND

The following facts are not in dispute.  This is a civil
action brought to obtain judicial review of a final decision
rendered by the Administrator ("the Administrator") of the Health
Care Financing Administration ("HCFA"), acting as a delegate of
the Secretary.  UIHC[1] appeals the determination of UIHC's "per

---

[1]    UIHC is a 902-bed teaching hospital located in Iowa City,
Iowa and operated by the University of Iowa.  At all times relevant
herein, UIHC operated as a "hospital" as defined at 42 U.S.C. §

COPIES TO COUNSEL
MAILED ON   2-12-97

1078

resident amount" for purposes of Graduate Medical Education ("GME") costs under 42 C.F.R. § 413.86. This action arises under Title XVIII of the Social Security Act, as amended (42 U.S.C. § 1395 et seq) (the "Act"), which establishes the Medicare Program (the "Medicare Program" or the "Program").

The Act establishes the Medicare Program which provides hospital and medical coverage to most persons over 65 years of age and to certain disabled persons. Under the Act, an eligible Medicare beneficiary is entitled to have payment made by the Medicare Program on his or her behalf for inpatient and outpatient hospital services provided to him or her by a hospital participating in the Medicare Program as a provider of services.

The amount of payment owing to a provider for services furnished to Medicare beneficiaries is determined by private insurance companies known as "intermediaries" acting as an agent of the Secretary. 42 U.S.C. § 1395h. The intermediary that acted on behalf of the Secretary with respect to UIHC was Blue Cross and Blue Shield of Iowa, acting as a subcontractor for Blue Cross and Blue Shield Association (hereinafter collectively referred to as the "Intermediary").

From the inception of the Medicare Program on July 1, 1966 until 1983, Congress provided that hospitals were entitled to be paid their "actual," "reasonable costs" for covered services furnished to beneficiaries. Under cost reimbursement, a

---

1395x(e) and was a "provider of services" participating in the Medicare Program within the meaning of 42 U.S.C. § 1395x(u) and 42 C.F.R. § 489.2(b)(1).

1079

hospital's total allowable costs were determined pursuant to the "principles of reimbursement," now codified at 42 U.S.C. § 413.1 et seq. When total allowable costs were determined for a hospital, the amount Medicare paid for services furnished to Medicare patients was determined through the "apportionment" process, a formula which apportioned costs to Medicare patients based on the items and services furnished to Medicare patients.

Included in allowable costs under the cost reimbursement methodology were education costs for "approved educational activities," including the reasonable costs of "graduate medical education" ("GME"). GME is training furnished to interns and residents, who have recently graduated from medical school. GME is conducted primarily in clinical settings, usually hospitals. Residents learn principally through the delivery of patient care.

For cost reporting periods beginning on or after October 1, 1983, Medicare implemented the "prospective payment system" in lieu of most cost reimbursement for acute inpatient hospital services. However, Congress specifically excluded costs of approved educational activities from the inpatient operating costs reimbursed under the prospective payment system. Payment for education costs continued to be made on a reasonable cost basis until Congress again amended the law in 1986.

In April of 1986, Congress enacted the Comprehensive Omnibus Budget Reconciliation Act ("COBRA"). COBRA changed the Medicare payment methodology for GME from reasonable cost reimbursement to payment of a rate per resident. 42 U.S.C. § 1395ww(h). The per

3

1080

resident amount is determined by each teaching hospital's cost per resident in the teaching hospital's "base year."  UIHC's base year was its fiscal year ending June 30, 1985.

Although the per resident amount methodology applies to cost periods beginning on or after July 1, 1985, the Administrator did not publish its proposed regulation to implement the law until September 21, 1988.  It did not publish the final regulation for determining GME costs, found at 42 C.F.R. § 413.86, until September 29, 1989.  54 Fed.Reg. 40286 (Sept. 29, 1989).  The per resident amount was computed by dividing each teaching hospital's allowable GME costs, under the "old" reasonable cost regulation, by the number of "full-time equivalent" residents ("FTEs").  42 C.F.R. § 413.86(e).

The determination of allowable GME costs was based on each teaching hospital's base year Medicare report.  Although the base year cost reports had already been audited by the time HCFA published the regulation implementing the per resident payment methodology in 1989, the Administrator instructed intermediaries to reopen those base year cost reports and reaudit GME costs. The number of FTE residents was based on information gathered during the GME audit process.  The intermediary's final determination of the per resident amount was furnished to the hospital in a Notice of Average Per Resident Amount.

A hospital can appeal its intermediary's determination of the hospital's per resident amount to the Provider Reimbursement Review Board (the "Board") pursuant to 42 U.S.C. § 1395oo(a), 42

1081

C.F.R. § § 405.1835 and 413.86(e)(1)(v). The Board's decision is
a final agency decision unless the Administrator, acting as the
Secretary's delegate, reverses, affirms, or modifies the Board
decision within 60 days. A hospital has the right to obtain
judicial review of any final decision of the Board, or any
reversal, affirmance, or modification by the Defendant Secretary.
42 U.S.C. §.139500(f).

UIHC's claimed costs for GME, stated as a per resident
amount, were $40,765. However, the final audited per resident
amount allowed by the Intermediary for UIHC was $33,538.

Since the inception of the Medicare program in 1966, UIHC
claimed the costs attributable to its teaching physicians in the
following manner. For teaching physician salaries and benefits,
UIHC claimed a portion of the costs attributable to the teaching
physicians who were involved in both the teaching of residents
and the administration of UIHC's GME program. In 1985, UIHC
claimed approximately 19 percent of the salary and benefit cost
for 91.5 of the total of 447 teaching physicians. UIHC claimed
all of the office space costs for all of its teaching physicians,
plus all of certain allocated costs for teaching physicians
including laundry and linen, cafeteria, secretarial support, and
office supplies.

UIHC's GME costs were initially allowed in full by the
Intermediary for purposes of calculating payment to UIHC for its
1985 cost reporting period. Of the 20 teaching hospitals in
Iowa, UIHC's claimed cost of $40,765 per resident was ranked

1082

exceeded $10 million, rather than the $1.7 million that was allowed by the Administrator.

UIHC's Medicare cost report claims for its GME costs, including teacher physician and overhead attributable to teaching physicians had been accepted by the Intermediary for all years prior to UIHC's FY 1985 audit.  The intermediary also accepted UIHC's cost reporting methodology in its original audit of UIHC's FY 1985 cost report.  On December 5, 1989, however, the Intermediary reopened UIHC's FY 1985 cost report on instructions from the Administrator and made the adjustments at issue in the present case.

The Intermediary's initial Notice of Per Resident amount dated August 31, 1990, was for only $24,430.  This amount did not include any costs attributable to the teaching physicians.  At the Administrator's direction, the Intermediary disallowed all teaching physician costs on the ground that UIHC's time studies showing how much time the physicians spent on various activities did not meet the Administrator's interpretation of the standards set forth in its regulations.  However, at the time that the Administrator directed the Intermediary to disallow teaching physician costs because of the lack of time record documentation meeting the Administrator's standards, the four-year record retention period under the Administrator's regulations had expired.  42 C.F.R. § 405.481(g)(3).

Pursuant to HCFA's policy, UIHC conducted time studies in 1991, and those time studies were accepted by the Intermediary as

1083

and required for purposes of the accreditation of UIHC's GME programs, the Intermediary disallowed the costs attributable to these residents because of its contention that the costs incurred were not related to patient care.

UIHC also offered elective rotations in nonprovider settings to a few of its residents. These rotations were also part of UIHC's approved GME program and were designed to give the residents experience in a physician office setting. The Intermediary disallowed the costs attributable to these residents. While the costs for both the research rotations and the off-premises physician office rotations were disallowed, those residents were included in the count of full-time residents for purposes of computing the per resident amount.

UIHC filed a timely and proper request for hearing with the Board regarding the Intermediary's adjustments disallowing UIHC's claim for GME costs for purposes of establishing a per resident amount. In a decision dated September 28, 1995, the Board ruled substantially in favor of UIHC. In a decision dated November 27, 1995, however, the Administrator affirmed and modified the Board's decision so that the final agency decision was adverse to UIHC in almost all respects. The Administrator's decision constitutes the final decision of the Defendant Secretary. UIHC timely sought judicial review of the Administrator's decision by filing this action.

## II.  LEGAL STANDARDS

### A.    Summary Judgment Standard

1084

Summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Walsh v. United States, 31 F.3d 696, 698 (8th Cir. 1994). The moving party must establish its right to judgment with such clarity that there is no room for controversy. Jewson v. Mayo Clinic, 691 F.2d 405, 408 (8th Cir. 1982). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. Id. at 248. "As to materiality, the substantive law will identify which facts are material....Factual disputes that are irrelevant or unnecessary will not be counted." Id.

B.   Standard of Review Under Administrative Procedure Act

Judicial review of a decision of the Board or the Administrator is governed by 42 U.S.C. § 1395oo(f), which incorporates the standards of section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Thomas Jefferson University v. Shalala, 114 S. Ct. 2381, 2386 (1994). The scope of review under the APA provides that a reviewing court:

> shall decide all relevant questions of law, interpret
> constitutional and statutory provisions, and determine

11

1085

the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(2)  hold unlawful and set aside agency action, findings, and conclusions found to be—

(A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ...

(D)  without observance of procedure required by law; ...

(E)  unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute.

5 U.S.C. § 706.  Under the arbitrary and capricious standard, the court must determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment."  Moto. Vehicle Mfrs. Assn. v. State Farm Mutual Ins. Co., 463 U.S. 29 (1983) (citing Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285 (1974)).  The standard of review is narrow.  "The court is not empowered to substitute its judgment for that of the agency."  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).

Under the substantial evidence standard, the evidence relied upon by the agency in reaching its determination must be "something more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  The court is to consider only the bases upon which the agency actually relied in reaching its decision.  Volpe, 401 U.S. at 420.

12

1086

An agency's interpretation of its own regulations is entitled to considerable deference. Udall v. Tallman, 380 U.S. 1, 16 (1965). The court must give that interpretation controlling weight unless it is "plainly erroneous or inconsistent with the regulation." Thomas Jefferson, 114 S. Ct. at 2386. In making this determination, the court looks to the plain meaning of the regulation or other indication of the Secretary's intent at the time of the regulation's promulgation. Id. at 2386-87. Deference is due an agency's interpretation "when an agency has developed its interpretation contemporaneously with the regulation, when the agency has consistently applied the regulation over time, and when the agency's interpretation is the result of thorough and reasoned consideration." Sioux Valley Hosp. v. Bowen, 792 F.2d 715, 719 (8th Cir. 1986) (citing Granville House, Inc. v. HHS, 715 F.2d 1292, 1296-97 (8th Cir. 1983) (quoting Skidmore v. Swift & Co., 323 U.S. 134 (1944))).

III. **ANALYSIS**

    A.   UIHC's Claim for Physician Offices, Clinic Secretaries, and Supplies.

The Board reversed the Intermediary's adjustments disallowing teaching physician office, secretarial, cafeteria, and laundry costs associated with the teaching physicians. In its decision, the Board determined that the office space was used almost exclusively for GME activity and any non-GME activity was de minimis. The Board further concluded that all of UIHC's physician-related secretarial, cafeteria, and laundry costs were

13

1087

allowable.  The Administrator reversed the Board and reinstated the Intermediary's total disallowance of all secretarial support costs.[2]  The Administrator also held that the physician time studies would have to be used to allocate the office costs. Thus, approximately 19 percent of the office costs were allowed as GME costs.  Furthermore, the Administrator found that all of the cafeteria and laundry facilities were considered fringe benefits--part of physician compensation.  Therefore, the Administrator determined that the cafeteria and laundry costs attributed to clinical faculty should be allocated to GME functions based on the time study.

   1.    Office Costs

---

[2]    The Court recognizes that the Board's determination may be entitled to some consideration when determining whether the Secretary's decision is supported by substantial evidence.  See NLRB v. Hawkins Constr. Co., 857 F.2d 1224, 1226 (8th Cir. 1988) ("While reviewing courts generally accord much deference to an agency's decision adopting the ALJ's findings, an agency's departure from such findings is vulnerable if it fails to reflect attentive consideration to the ALJ's decision.") (citation and internal quotations omitted).  "This is particularly true when the credibility of witnesses is important to the case." Id. (citations omitted); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 496 (1951) ("[E]vidence supporting [an agency's] conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the [agency's] than when he has reached the same conclusion.").    However, in the present case, the Administrator reversed the Board's decision based on the lack of documentation supporting UIHC's claim, rather than the testimony presented to the Board.  As a result, and based on the analysis of the Administrator, the Court concludes that the Administrator's decision did not "fail to reflect attentive consideration to the [Board's] decision." See Hawkins, 857 F.2d at 1226; see also Girling Health Care, Inc. v. Shalala, 85 F.3d 211, 215 (5th Cir. 1996) ("Although deemed equal in expertise with the PRRB, the Secretary nevertheless has the option of making the final decision, and hers is the only one that is subject to judicial review.").

14

1088

Both parties agree that patients were not seen or treated in the physician offices.[3] Furthermore, "but for" the existence of UIHC's GME program, there would not have been any physician offices furnished by UIHC. (A.R. 302). UIHC also produced testimony indicating that the offices were used by the GME physicians for the teaching of residents and the administration of the GME program.[4]

However, the Administrator concluded that the provider hospital's evidence did not meet the criteria of the regulations at 42 C.F.R. § § 413.20 and 413.24, nor supported the allocation of 100 percent of the physicians' office space as GME-related. The Administrator stated that photographs and testimony produced by UIHC may have indicated that the physicians' offices were not used to procure patient care, but they failed to indicate how the physicians otherwise divided their time in the offices.[5] (A.R. 23). The Administrator also noted that testimony is the least

---

[3]    There was also evidence that dictating equipment and patient consultation rooms were available in the clinic. UIHC argues that, as a result, there was no need for the physicians to use their administrative offices for dictating patient records.

[4]    The Board found that "there may have been some non-GME activity" although the Board believed it to be de minimis. (A.R. 87).

[5]    UIHC produced testimony and photographs that the physician office space was used for GME and not direct patient care. (A.R. 293-94, 655-57). The Administrator noted that the administrative functions performed by a physician can include various activities including patient care related activities, hospital administrative activities and GME-related activities. (A.R. 23).

15

428; 451).

Thus, according to the Secretary, UIHC had a duty to keep time records on the usage of teaching physician office space that differentiated between the use of that space for teaching and for other nonteaching administrative purposes.[8] Based on the foregoing, the Court must determine whether the Administrator's determination that UIHC's documentation of its office costs was insufficient was arbitrary or not supported by substantial evidence. Related to this is the issue of whether the Administrator can require UIHC to document the differentiation of its office costs between GME related costs and other costs. Finally, if the Court decides, pursuant to the proper legal standard, that the Administrator's decision not to accept the testimonial evidence in support of UIHC's assertion that 100% of the office costs should be allocated to the GME program was appropriate, the Court must determine whether the use of the physician time study was arbitrary or not supported by substantial evidence.

Under the general record keeping requirements at 42 C.F.R. § § 413.20 and 413.24, providers are required to have adequate cost data subject to verification by auditors, and are required to maintain sufficient financial records and statistical data for proper determination of costs payable under the program. 42

---

[8]     The testimony before the Board does not indicate that the offices were used for administrative purposes aside from the GME program, only that it was conceivable that the offices at issue were used for administrative purposes besides the GME program. (A.R. 301-02).

1090

C.F.R. § 413.20(a) and 413.24(a), (c).[9]  In other words, the
provider bears the burden of maintaining financial records and
statistical data sufficient for proper determination of costs
payable under the program.  Girling Health Care, Inc. v. Shalala,
85 F.3d 211, 215 (5th Cir. 1996) (citing 42 C.F.R. § 413.20(a));
Remedial Care, Inc. v. Shalala, 1994 WL 693438 at *2 (E.D.La.
December 8, 1994).

UIHC failed to produce statistical data or time records on
the usage of teaching physician office space that differentiated
between the use of that space for teaching and for other
administrative purposes.  Instead, UIHC produced photographs and
testimonial evidence indicating that the offices were used
primarily for the administration of the GME program.

According to the plain language of the regulations relied
upon by the Secretary, UIHC was required to produce sufficient
financial records and statistical data for the verification of
its GME costs.  The Administrator's rejection of the testimonial
evidence because it was insufficient to document UIHC's costs was
consistent with the terms of 42 C.F.R. § 413.20 and 413.24 and is
therefore not arbitrary or unsupported by substantial evidence.
Furthermore, while the Administrator may not be able to require
UIHC to differentiate between provider component costs, the

---

[9]    "The principles of cost reimbursement require that
providers maintain sufficient financial records and statistical
data for proper determination of costs payable under the program."
42 C.F.R. § 413.20(a).  This data must be "capable of verification
by qualified auditors" and "in sufficient detail to accomplish the
purposes for which it is intended."  42 C.F.R. § 413.24(a), (c).

18

1091

care related activities.[11]  It is uncontested that no direct

patient care took place in the physician offices.

Because no direct patient care took place in the offices,

the Court concludes that application of the 1991 time studies,

without adjusting for this fact, was arbitrary and not supported

by substantial evidence.  The office costs should be allocated on

the basis of physician time, but direct patient care time, which

was approximately 35 percent of the total, should be omitted from

the allocation.

    2.   Laundry, Cafeteria, Office Supplies, and
        Secretarial Support Costs.

    a.   Laundry, Cafeteria, and Office Supplies

UIHC claimed 100 percent of the laundry, cafeteria, and

office supplies costs related to faculty physicians.  Rather than

allow 100% of these costs, the Administrator modified the Board's

decision by applying the time studies to the laundry, cafeteria,

and office supply costs.  Based on the previous section, the

Court concludes that the Administrator's use of the 1991 time

studies to allocate the overhead costs of laundry, cafeteria, and

office supplies[12] is proper and supported by substantial evidence.

---

    [11]   The time studies indicate that approximately 35% of the
physicians' time was spent in "patient care in an instructional
setting." (A.R. 614).  It is also clear that this amount did not
include the administrative services associated with direct patient
care because the time studies included separate categories for
"UIHC patient related committees and administrative activities,"
"house staff program administration," "sponsored projects
administration," and "university wide administration." (A.R. 614).

    [12]   Unlike the allocation of physician office costs, there is
no agreement between the parties that office supplies were not used
in the provision of direct patient care.  As a result, the

1092

B.    UIHC's Claim for Residents Participating in Approved
      Nonprovider and Research Rotations

The Intermediary disallowed the costs related to the time
residents spent in elective -- off premises rotations, including
non-sponsored research (7.66 FTEs), university student health (.9
FTEs), community practice preceptorships (.54 FTEs), and the
neurobehavior lab (.3 FTEs).  The Intermediary disallowed these
costs because the related activities took place in a nonprovider
setting.  Nevertheless, the Intermediary included the research
time of the residents in the research setting in determining the
total FTEs for purposes of computing the per resident amount.
The Board reversed the Intermediary and found that the on-site
resident research costs and the off-site resident activities were
related to patient care and allowable.  The Administrator
modified the Board's decision and adopted the adjustments that
had been made by the Intermediary disallowing the costs of
residents involved in research or assigned to nonprovider sites.

UIHC argues that the Administrator's decision concerning
residents participating in research rotations should be reversed
for three reasons.  First, the "research" rotations directly
related to patient care since they were on hospital premises,
involved patients, and developed the residents' practical skills
and techniques directly applicable to patient care activities.
Second, patient care in nonprovider sites enhance the quality of
care in an institution.  Third, education costs are allowable
regardless of provider premises issues.  Furthermore, UIHC argues
that even if the Court finds that it is proper to disallow the

1093

costs of the residents, there is no justification for including these residents in the FTE count of residents.

### 1.    Training off Hospital Premises

The Secretary first argues that the Administrator's decision should be upheld because resident training that occurs off the hospital's physical premises are not allowable costs.  Regulation 413.85 provides that Medicare will pay for the reasonable costs of a provider's medical education activities.  The regulation states that "[a] provider's allowable cost may include its net cost of approved educational activities..."  42 C.F.R. § 413.85(a)(1).  "Approved educational activities" means "formally organized or planned programs of study usually engaged in by providers in order to enhance the quality of patient care at an institution."  42 C.F.R. § 413.85(b).

Weighing against the Secretary's argument, 42 C.F.R. § 413.85 does not expressly require that programs be conducted on a provider's premises.[13]  In <u>University of Cincinnati v. Bowen</u>, 875 F.2d 1207 (6th Cir. 1989) the intermediary disallowed the costs related to the hospitals residents' rotations in outpatient clinics because the costs were not related to the care of the hospital's patients and the outpatient clinics were not part of

---

[13]    In addition, the Provider Reimbursement Manual ("PRM") § 414.2A, which contains nonbinding interpretive rules, has stated that the nursing and paramedical education costs including classroom training are allowable.  <u>See Shalala v. St. Paul-Ramsey Medical Center</u>, 50 F.3d 522, 528 n.4 (8th Cir. 1995) (noting that the PRM is normally construed to contain only non-binding interpretive rules).  Costs incurred in providing classroom training may be costs incurred other than the hospital's patient care areas.

1094

the hospital.  Id.  The Sixth Circuit found the administrative

decision upholding the intermediary's adjustments to be

inconsistent with the plain meaning of the Medicare regulation

and thus not entitled to deference.  Id. at 1212.  The Court held

that:

> The plain meaning of the regulations does not require
> residents to directly perform services for Hospital
> patients to the exclusion of clinic patients as part of
> their educational activities.  Section 415.421(c)
> states, "Many providers engage in educational
> activities including training programs for [residents].
> These programs contribute to the quality of patient
> care within an institution ...."  (Emphasis added.)
> Section 415.421 requires only that the educational
> programs contribute to the quality of care of the
> Hospital's Medicare patients.  Given that the
> outpatient clinic programs are accredited programs
> required as a part of the residents' training, they
> ipso facto contribute to the quality of care received
> by the Hospital's Medicare patients.  The skills and
> training received by the residents in the clinics are
> transferred back to the Medicare patients during the
> residents' rotation with the hospital.

Id. at 1211.

Thus, the Sixth Circuit recognized that the residents' time spent

at the Central Psychiatric Clinic and the Family Practice Clinic

could contribute to the quality of care received by the

hospital's Medicare patients even though the clinics were not

part of the hospital and the residents did not directly perform

services to the hospital patients to the exclusion of the clinic

patients as part of their educational activities.  Id.

Similarly, in Loyola Univ. of Chicago v. Bowen, 905 F.2d

1061, 1072 (7th Cir. 1990) the Seventh Circuit reversed the

Secretary's ruling determining that in order for the provider's

educational activities to be reimbursable, the activities must

24

1095

occur in a facility which is "part of the provider." Id.  The
Secretary had denied the provider's claim for reimbursement of
the stipends paid to its residents attributable to the time they
spent in a non-hospital certified clinic.  Id. at. The Court
analyzed 42 C.F.R. § 413.85 and stated:

> From our reading of this regulation, we are unable to
> find with the above language a requirement that
> educational activities occur in the provider or a
> facility that is "part of the provider" in order for
> the activities to be deemed reimbursable under
> Medicare.  Thus, because the Secretary's "part of the
> provider" requirement is not contained in the
> regulations—regulations which the Secretary
> promulgated—we refuse to defer to the Secretary's
> interpretation of the regulations ... and reject his
> interpretation that educational activities must occur
> in a facility that is "part of the provider" to qualify
> for Medicare reimbursement.

Id. at 1072.

As indicated previously, the agency's interpretation of the
Medicare regulations must be given controlling weight unless it
is plainly erroneous or inconsistent with the regulation.  Thomas
Jefferson, 114 S. Ct. at 2386–87.  Based on the plain language of
42 C.F.R. § 413.85 and the reasoning of the courts in University
of Cincinnati and Loyola, the Court concludes that the
Secretary's interpretation of 42 C.F.R. § 413.85 is plainly
erroneous and inconsistent with the regulation.  As a result, the
costs of the residents of UIHC related to patient care are
reimbursable even if that activity occurs at a nonprovider site.
Thus, the costs related to the time residents spent in the
elective—off premises rotations of university student health (.9
FTEs), community practice preceptorships (.54 FTEs), and

25

neurobehavior lab (.3 FTEs) are reimbursable.

>    2.    Research Rotations

In addition to its argument that the costs of residents working in nonprovider settings were properly disallowed as GME costs, the Secretary asserts that there is no evidence in the record that the research involving patients constituted "usual patient care"—care that was medically reasonable, necessary, and ordinarily furnished. (A.R. 29–31). UIHC asserts that its GME–related research activities, which accounted for 7.66 FTE residents, fit within the scope of an educational activity, justifying the allocability of UIHC residents' research costs.

"Costs incurred for research purposes, over and above usual patient care, are not includable as allowable costs." 42 C.F.R. § 413.90 (a).[14] "If research is conducted in conjunction with, and as part of, the care of patients, the costs of usual patient care are allowable to the extent that such costs are not met by funds provided for the research." 42 C.F.R. § 413.90(b)(2). The costs for research activities, over and above usual patient care,

---

[14]    "Usual patient care" is defined as "care which is medically reasonable, necessary, and ordinarily furnished (absent any research programs) in the treatment of patients by providers under the supervision of physicians as indicated by the medical condition of the patients. Provider Reimbursement Manual ("PRM") § 502.2. Research is defined as "a systematic, intensive study directed toward a better scientific knowledge of the science and art of diagnosing, treating, curing, and preventing mental or physical disease, injury, or deformity; relieving pain; and improving or preserving health. Research may be conducted at a laboratory bench without the use of patients or it may involve patients. Furthermore, there may be research projects that involve both laboratory bench research and patient care research. PRM § 502.2.

1097

even if required for the GME are not allowable.  GME Questions and Answers, No. 39 (Nov. 1990) (P. Ex. 2).  However, GME programs intended solely to develop the residents practical skills and techniques that will be directly applicable to patient care activities are allowable if the hospital rather than the school incurs the costs of such activities.  Id.  The issue the Court must decide is whether the Administrator's decision that the UIHC's non-sponsored research programs for its residents were neither solely intended to develop the residents' practical skills and techniques that will be directly applicable to patient care nor were conducted in conjunction with, and as part of, the care of patients, is supported by substantial evidence.[15]

UIHC asserts that the record indicates that the research rotations were not over and above usual patient care.  Rather, UIHC asserts that the research rotations were conducted in conjunction with, and as part of, the care of patients, or intended to develop the residents' practical skills and techniques that will be directly applicable to patient care.  In support, UIHC cites the affidavit of teaching physician Dr. Raymond R. Crowe.  Dr. Crowe indicated that the research rotations were patient-oriented and the residents were required to engage in direct patient contact.  (A.R. 165).  He also

---

[15]    Interpreting the Secretary's guidelines as a whole, to be reimbursable, the research rotations must be solely intended to develop the residents' practical skills and techniques, rather, than be designed as a systematic, intensive study directed toward a better scientific knowledge of medicine.  (Question and Answer No. 39; PRM § 502.2).

1098

indicated that as part of the UIHC's "Continuity of Care" program, residents furnished patients participating in the research activities health services regularly and frequently for an extended period of time. (A.R. 165-66).

Dr. Crowe stated that the research rotations were designed to enhance the residents' skill in four areas: (1) the critical evaluation of professional and scientific literature; (2) the examination of patients; (3) communication with patients; and depending on the nature of the research activity, (4) the early detection of disease. (A.R. 166). The research rotation directly related to patient care because "the residents were better able to respond to the needs of patients" and "overall patient care at the Provider was improved." (A.R. 166).

In contrast, the Secretary argues that the Administrator reasonably concluded that the activities of the residents in research rotations constituted research activities over and above usual patient care. The Secretary states that the statements of Dr. Crowe that the research rotations were "patient-oriented" and that "residents were required to engage in direct patient contact" (A.R. 223) suggests that the research was neither necessary nor ordinarily furnished. The Secretary also asserts that because the participating patients were volunteers, the rotations were not necessary or ordinarily furnished. (A.R. 224). The Secretary further states that aspects of the research rotations such as attending seminars, participating in case presentations, reading and evaluating scientific literature,

1099

providing written results of research, and enhancing a resident's
skills in early detection of disease are actions consistent with
the "systematic, intensive study" contemplated by the PRM in
defining research.

Even if the Court were to accept the Secretary's
characterization of the research rotations as being outside the
usual scope of patient care, it does not necessarily follow that
the research rotations were not part of UIHC's allowable rotation
costs.  As indicated previously, according to the relevant
Question and Answer created and cited by the Secretary, the Court
must determine whether the research rotations were intended
solely to develop the residents practical skills and techniques
that will be directly applicable to patient care activities.  See
also Castellano v. City of New York, 946 F. Supp. 249, 254
(S.D.N.Y. 1996) (holding that the "Questions and Answers"
guidelines of the EEOC were entitled to deference by the
reviewing court).

The Administrator failed to cite any evidence in the record
that supports its contention that the research rotations were not
intended solely to develop the residents practical skills and
techniques that will be directly applicable to patient care
activities.[16]  All of the aforementioned evidence cited by the
Administrator to support its disallowance should reasonably be
interpreted as activities which developed the residents'

---

[16]    The Administrator also acknowledged that the research
performed by the residents was part of UIHC's approved residency
program.

29

1100

practical skills and techniques related to patient care rather than a systematic and intensive study directed toward a better scientific knowledge. In other words, the Secretary's conclusion is not based on evidence such that a "reasonable mind might accept as adequate to support [the Secretary's] conclusion" that the research rotations were not solely to develop the residents' practical skills and techniques that will be directly applicable to patient care activities. See Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Especially in light of Dr. Crowe's statements, the Court concludes that the Secretary's determination that the research rotations are for over and above usual patient care, is not supported by substantial evidence.[17]

C.    UIHC's Claim for Costs Relating to Teaching Physicians[18]

In its fiscal year ending 1985, UIHC claimed 19.09 percent of the compensation of 91.5 teaching physicians as a GME cost. When it was clear that the Administrator had directed the Intermediary to make very large adjustments to UIHC's base year costs, UIHC supplemented its claim to include the teaching portion, 19.09%, of the salary and benefit costs for the 355 faculty members whose salary and benefit costs had not been claimed in the 1985 cost report. However, the Board and the

_____

[17]    In light of the Court's conclusion, it is unnecessary for the Court to determine if 42 C.F.R. § 413.86(e)(1)(i)(B) is arbitrary and capricious.

[18]    UIHC's claim is relevant only to the extent that this Court affirms the adverse Administrator's decision with respect to teaching physician office costs and other teaching physician overhead costs.

30

JUN. 27. 2001  1:16PM    NARA CNTRL PLNS REG    NO. 4131    P. 32/38

Secretary disallowed UIHC's supplemental claim for teaching physician salaries and benefits because of the regulatory bar on the allocability of costs "redistributed" from an educational institution to a hospital and on allowing educational costs after the "community" has undertaken to support a healthcare educational program.  See 42 C.F.R. § 413.85(c).[19]

UIHC's original claim for physician-related costs in 1985 was $4.6 million.  UIHC asserts that as long as its allowed costs are at or below the level that would have been allowed under the historic methodology previously accepted by the Intermediary, there can be no viable claim that the supplemental claim is prohibited by the anti-redistribution rule.  In essence, UIHC argues that the claim for physician related costs should be treated in the aggregate for purposes of the anti-redistribution rule.  In addition, UIHC asserts that there is no evidence in the record of an identifiable funding source for that portion of the GME costs not included in UIHC's original claim.

The Secretary, on the other hand, states that the record indicates that UIHC historically claimed physician compensation costs for 92 physicians directly involved in the administration and supervision of its GME program.  With the advent of the new GME regulations, the Secretary states that UIHC attempted to increase its claim for physician compensation to include costs for all 447 physicians involved in the program.  As a result, the

---

[19]    In regards to the community support argument, the Administrator presumed that the costs not claimed in the original 1985 cost report were "absorbed by other community sources."

Secretary asserts that there would be a prohibited redistribution
of costs if UIHC's claim for increased physician compensation
were allowed.

In addition to finding a prohibited redistribution of costs,
the Secretary points out that the Administrator also identified a
violation of the community support provisions of the regulation.
The Secretary argues that UIHC's failure to seek reimbursement
for the disputed costs in previous years leads to the
Administrator's presumption that the costs were absorbed by other
community sources even though the Secretary admits that there is
no evidence of specific community funding sources in the record.
However, the Secretary states that the existence of 355 faculty
physicians for whom no claim of reimbursement from Medicare had
been made prior to this dispute supports the Administrator's
conclusion that there was evidence of community or state support.

The anti-redistribution rule is contained in 42 C.F.R. §
413.85(c):

> Many providers engage in educational activities ....
> These programs contribute to the quality of patient
> care ... and are necessary to meet the community's
> needs for medical and paramedical personnel.  It is
> recognized that the costs of such education activities
> should be borne by the community.  However, many
> communities have not assumed responsibility for
> financing these programs and it is necessary that
> support be provided by those purchasing health care.
> Until communities undertake to bear these costs, the
> program will participate appropriately in the support
> of these activities ...
>
> Although the intent of the program is to share in the
> support of educational activities customarily or
> traditionally carried on by providers in conjunction
> with their operations, it is not intended that this
> program should participate in increased costs resulting

32

from the redistribution of costs from educational
institutions ... to patient care institutions ....

42 C.F.R. § 413.85(c).

The bar against the redistribution of educational costs in
the above regulation was interpreted by the Supreme Court in
Thomas Jefferson Univ. Hosp. v. Shalala, 114 S. Ct. 2381 (1994).
In Thomas Jefferson, the appealing hospital had increased its
claim several times over the history of the Medicare program.
The last increase in its claim included a type of cost, medical
school overhead, which had never been claimed to any extent.  In
ruling against the hospital, the Court stated:

> The circumstances addressed by the anti-redistribution
> clause is a hospital's submission of "increased costs"
> arising from approved educational activities.  The
> regulation provides, in unambiguous terms, that the
> "costs" of these educational activities will not be
> reimbursed when they are the result of a
> "redistribution," or shift, of costs from an
> "educational" facility to a "patient care" facility,
> even if the activities that generated the costs are the
> sort "customarily or traditionally carried on by
> providers in conjunction with their operations."  §
> 413.85(c).  The Secretary's reliance on a hospital's
> own historical allocations, along with those of an
> affiliated medical school, is a simple and effective
> way of determining whether a prohibited "redistribution
> of costs" has occurred.  Indeed, one would be hard-
> pressed to come up with an alternative method to
> identify the shifting of costs from one entity to
> another.

Id. at 2387.

The issue the Court must decide is whether, for purposes of
determining whether there has been a redistribution of costs, the
GME costs should be aggregated, or, separated, with the
redistribution test applied to each subcategory of costs.  In
deciding this issue, the Court must give the agency's

33

1104

interpretation of the regulation controlling weight unless it is plainly erroneous or inconsistent with the regulation. <u>Id.</u> at 2386. In other words, the Court must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation. <u>Id.</u> at 2386-87 (citation omitted). Moreover, such deference is particularly appropriate in the field of Medicare reimbursement. <u>Id.</u> at 2387; <u>Abbott-Northwestern Hospital Inc. v. Schweiker</u>, 698 F.2d 336, 340 (8th Cir. 1983).

The "regulation provides, in unambiguous terms, that the 'costs' of these educational activities will not be reimbursed when they are the result of a 'redistribution,' or shift, of costs from an 'educational' facility to a 'patient care' facility, even if the activities that generated the costs are the sort 'customarily or traditionally carried on by providers in conjunction with their operations." <u>Thomas Jefferson</u>, 114 S. Ct. at 2387 (citing § 413.85(c)). The "shift of <u>any</u> reimbursable [cost] from an educational institution or unit to a patient care institution or unit is prohibited." <u>Id.</u> at 2388 (emphasis added).

Consistent with 42 C.F.R. § 413.85 and the Supreme Court's reasoning in <u>Thomas Jefferson</u>, the Administrator concluded that UIHC, by attempting to claim the compensation costs for a group of 355 faculty physicians for whom it had never made such a claim, caused a "shift of a reimbursable cost" from an

1105

educational institution to a hospital.  There is nothing in the regulation or the Supreme Court's opinion which dictates that the GME costs should be aggregated before the redistribution analysis can be made.  In fact, the Supreme Court's statement that a "shift of any reimbursable [cost] from an educational institution or unit to a patient care institution or unit is prohibited," id at 2388, implies that a transfer of physician compensation costs previously incurred by the University of Iowa to the hospital is prohibited, regardless of whether there has been a redistribution of costs in the aggregate.  Based on the foregoing, the Court concludes that the Secretary's construction of 42 C.F.R. § 413.85(c) is a reasonable one and, therefore, should be affirmed.

JUN. 27. 2001  1:18PM   NARA. CNTRL PLNS REG                    NO. 4131   P. 37/38

**IV.   CONCLUSION**

Based on the foregoing, the Secretary's Motion for Summary Judgment concerning UIHC's claim for reimbursement of laundry, cafeteria, office supplies, and secretarial support costs is granted.  Also, the Secretary's Motion for Summary Judgment regarding UIHC's claims for increased costs for additional teaching physicians is granted.  UIHC's Motion for Summary Judgment regarding its claims for the reimbursement of costs for residents participating in approved nonprovider and research rotations is granted.  In addition, UIHC's claim for reimbursement of office costs as analyzed by the Secretary should be modified.  The office costs should be allocated on the basis of the physician time study used by the Secretary, but direct patient care time should be omitted from the allocation.  Insofar as the parties' seek additional relief, their motions are denied.

The case is remanded to the Secretary for the determination of UIHC's per resident amount consistent with this order.

IT IS SO ORDERED.

Dated this 17th day of February, 1997.

RONALD E. LONGSTAFF, JUDGE
UNITED STATES DISTRICT COURT

36

1107

# United States District Court

FILED
DAVENPORT, IOWA

97 FEB 12 PM 4 13

## SOUTHERN DISTRICT OF IOWA - DAVENPORT DIVISION

SOUTHERN DISTRICT OF IOWA

### JUDGMENT IN CIVIL CASE

NIVERSITY OF IOWA HOSPITALS & CLINICS,,
Plaintiff

v.

**CASE NUMBER: 3-96-CV-10012**

CONNA E. SHALALA, AS SECRETARY HHS,,
Defendant

___  **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

**X**  **Decision by Court.** This action came to consideration before the Court. The issues have been decided and a decision has been rendered.

IT IS ORDERED AND ADJUDGED: The Secretry's Motion for Summary Judgment re UIHC's claim for reimbursement of laundry, cafeteria, office supplies & secretarial support costs is granted. Secretary's Motion for Summary Judgment re UIHC's claims for increased costs for additional teaching physicians is granted. UIHC's Motion for Summary Judgment re claims for reimbursement costs for residents participating in approved nonprovided & research rotations is granted. In addition, UIHC's claim for reimbursement of office costs as analyzed by the Secretary should be modified. Insofar as the parties' seek additional relief, their motions are denied. This case is remanded to the Secretry for the determination of UIHC's per resident amount consistent with this order.

<u>February 12, 1997</u>
Date

<u>JAMES R. ROSENBAUM</u>
Clerk

*(signature)*
**(By) Deputy Clerk**

2-12-97

1108