IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE UNIVERSITY OF CHICAGO MEDICAL CENTER, D/B/A UNIVERSITY OF CHICAGO HOSPITALS & CLINICS, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 07 CV 7016 |
| vs. | ) ) | Wayne R. Andersen |
| KATHLEEN SEBELIUS, SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) ) ) | District Judge |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, The University of Chicago Medical Center, d/b/a University of Chicago Hospitals & Clinics ("Hospital"), filed the instant suit against Kathleen Sebelius ("Secretary"), in her capacity as the Secretary of The United States Department of Health and Human Services, alleging that the Secretary improperly calculated the Hospital's Medicare payments for the fiscal year of 1996 by excluding residents involved in educational research from the indirect medical education full-time equivalent residents count. This case is before the Court on the Hospital's and the Secretary's motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, the Hospital's motion for summary judgment is granted and the Secretary's cross-motion for summary judgment is denied.

# BACKGROUND

## A. *The Relevant Statutes:*

Prior to 1983, a hospital received Medicare payments based on the hospital's reasonable costs of inpatient hospital services. 42 U.S.C. § 1395f(b1), 1395d(a)(1). These payments reimbursed a hospital for actual expenses incurred. However, Congress abandoned the reasonable cost system after determining that government costs were too high. *See* 42 U.S.C. § 1395x(v)(a)(A); *see also* 42 C.F.R. § 413.30.

The reasonable cost system was replaced by the Prospective Payment System ("PPS") in 1983. Under the PPS, hospitals receive payments based on a patient's diagnosis at discharge, regardless of the hospital's actual or reasonable costs associated with treating that patient. 42 U.S.C. § 1395ww(d); 42 C.F.R. § 412.60. Congress switched to the PPS in order to promote efficient healthcare services. *See Riverside Methodist v. Thompson*, 2003 WL 22658129, at *2 (S.D. Ohio July 31, 2003). The PPS encourages efficiency by allowing a hospital to keep the full PPS payment, even if the hospital can efficiently treat a patient at a cost that is lower than the PPS payment. *See id.*

However, because teaching hospitals generally incur more costs than non-teaching hospitals, Congress grants teaching hospitals additional payments under the PPS. *See* H.R. Rep. No. 98-25(I) at 140-41 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 219, 359-60; S. Rep. No. 98-23, at 52-53 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 143, 192. These additional payments are comprised of both "direct" and "indirect" payments. 42 U.S.C. § 1395ww(h), 1395ww(d)(5)(B). The direct payments are not disputed in this case, but they include easily quantifiable costs, such as a resident's salary and fringe benefits. *See* 42 U.S.C. § 1395; *Rhode Island Hospital v.*

*Leavitt*, 501 F. Supp. 2d 283, 286 (D. R.I. 2007) *rev'd by Rhode Island Hospital v. Leavitt*, 548 F.3d 29 (1st Cir. 2008); *University Medical Center Corp. v. Leavitt*, 2007 WL 891195 at *4; *Riverside Methodist*, 2003 WL 22658129 at *2 n.4; 42 C.F.R. § 413.86 (1996). *See also* H.R. Rep. No. 98-25(I) at 140-41 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 219, 359-60; S. Rep. No. 98-23, at 52-53 (1983), *as reprinted in* 1983 U.S.C.C.A.N. 143, 192.

The parties dispute the proper amount of indirect medical education ("IME") payments that are owed to the Hospital for the fiscal year 1996. IME payments are authorized by statute: "[t]he Secretary shall provide for an additional payment amount for subsection (d) hospitals with indirect costs of medical education, in an amount computed in the same manner as the adjustment for such costs under regulations [in effect as of January 1, 1983]." 42 U.S.C. § 1395ww(d)(5)(B). The IME payment is derived at by multiplying the PPS payment by the "IME factor," also referred to as the "teaching adjustment factor." *See* 42 U.S.C. § 1395WW(D)(5)(B); *see also Rhode Island Hospital v. Leavitt*, 548 F.3d 29 (1st Cir. 2008).

The IME factor is intended to reflect the level of teaching intensity at a teaching hospital, and it is arrived at by means of a mathematical formula that was created by statute in 1983: $[\{1+(R/B)\}^n - 1] \times C$; R, the disputed variable in this case, represents the number of full-time equivalent ("FTE") residents; B represents the number of hospital beds; n is .405, the measurement factor for teaching activity; and C represents the statutory adjustment factor. 42 U.S.C. § 1395ww(d)(5)(B). Therefore, in order to gauge the level of teaching intensity at a hospital, Congress created a formula that focuses on the ratio of full-time equivalent (FTE) residents to the hospital's total number of beds. As the number of FTE residents increases, the

hospital's indirect medical education (IME) factor increases, and consequently, the hospital receives a higher IME payment from Medicare.

Both parties agree that the PPS is not applicable to all hospitals, or even all units of a hospital. Specifically, the PPS only applies to "subsection (d) hospitals," which consist of acute-care hospitals. The requirement of acute-care hospital excludes, *inter alia*, psychiatric hospitals and rehabilitation hospitals, as well as all psychiatric or rehabilitation units within hospitals. *Rhode Island*, 501 F. Supp. 2d at 285; 42 U.S.C. § 1395ww(d)(1)(B). Residents assigned to these hospitals or units are excluded from the IME FTE resident count because those hospitals and units are still paid under the reasonable cost system, which "already include[s] the indirect cost of medical education." 48 Fed. Reg. 39,752, 39,778 (Sept. 1 1983). Therefore, while both parties agree that research conducted in these non-PPS hospitals or these non-PPS units of hospitals are excluded from IME FTE resident count, as seen below, the parties dispute whether a resident who performs educational research that is mandated by a residency program must be included in the IME FTE resident count.

### B. The Relevant Regulations:

The regulation in effect during 1996, the fiscal year at issue in this case, states that residents will be included in a teaching hospital's indirect payment if: 1) the resident is "enrolled in an approved teaching program," and 2) the resident is "assigned to…[a] portion of the hospital subject to the [PPS]." 42 C.F.R. § 412.105(g) (1995). The parties do not dispute whether the residents in this case were enrolled in an approved teaching program. The only dispute concerns whether the residents were assigned to a "portion" of the hospital that is subject to the PPS.

4

Although the 1996 regulation governs this case, the parties argue that two subsequent amendments to the statute and regulation might be relevant.  First, in 1997, Congress amended the statute under which the 1996 regulation was promulgated.  The statutory amendment applies only in *non-hospital* settings, and it requires the Secretary to exclude a resident's research from indirect medical education payments, unless the research is directly related to a patient's care.  Thus, the 1997 amendment includes a direct patient care requirement in non-hospital settings.

An amendment to the regulation occurred in 2001 and it arguably clarifies the meaning of the 1996 regulation.  The 2001 amendment explicitly excluded a resident's educational research time from indirect payments to teaching hospitals.  Thus, if the 2001 amendment were applied to this case, the regulation would direct this Court to exclude the resident's research time from the IME FTE count.  As seen below, however, whether the amendment is reasonable or whether the amendment exceeds statutory authority is beyond the scope of this opinion.

## PROCEDURAL HISTORY

At the close of fiscal year 1996, in order to obtain direct and indirect medical education payments from Medicare, the Hospital submitted a cost report to the Secretary's fiscal intermediary.  The fiscal intermediary excluded the educational research conducted by the Hospital's residents from its calculation of the Hospital's IME FTE count.  (AR 133.)  Specifically, the intermediary's calculation excluded over 50 FTE residents, and the Hospital contends that the exclusion of these residents amounts to a deficiency in payment of $2,607,048.  (AR 10, 41, 47, 243.)  The Hospital pursued an administrative appeal to the Provider Reimbursement Review Board ("Review Board") under 42 U.S.C. § 1395oo.  The Review Board reversed the fiscal intermediary's decision and held that a resident's research time should be

included in the calculation of indirect payments. (AR 131-36.) This decision was appealed to the Administrator of the Centers for Medicare and Medicaid Services ("CMS"). The CMS Administrator reversed the Review Board's decision and excluded the resident's research time from the calculation of the IME FTE resident count. (AR 2-14.) The Hospital appealed the CMS Administrator's decision to this Court under 42 U.S.C. § 1395oo(f).

## STANDARD OF REVIEW

This Court exercises jurisdiction over this action pursuant to 42 U.S.C. § 1395oo(f), which states that cases arising out of disputes under the Administrative Procedures Act ("APA") "shall be tried pursuant to the applicable provisions under chapter 7 of title 5." The provision of the APA that governs the scope of review in this case is 5 U.S.C. § 706. This section provides that an agency's decision may only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); *Citizens to Preserve Overton park v. Volpe*, 401 U.S. 402, 413-15 (1971). Under the substantial evidence standard, a court may not "displace the…[Secretary's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). The Supreme Court has "defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 619-20 (1966) *quoting Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938) (requiring "more than a mere scintilla"); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997).

An agency's construction of the statute is generally governed by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837. Under *Chevron*, courts engage in a two step inquiry. First, the court determines whether Congress "has directly spoken to the precise question at issue." *Id.* at 842-43. If Congress' intent is clear, then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* If, however, the statute is ambiguous, the court must advance to the second step in the *Chevron* inquiry, which involves determining whether the agency's interpretation is based upon a permissible construction of the statute. *Id.*

When the construction of an administrative regulation is at issue, a court is required to defer to an agency's interpretation of its own regulation when the regulation is ambiguous. *Christensen v. Harris County*, 529 U.S. 5576, 588 (2000). However, although the task before the court "is not to decide which among several competing interpretations best serves the regulatory purpose," a court shall not defer to an agency's interpretation of its own regulation when an "alternative reading is compelled by the regulation's plain language or by other indication of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994). Moreover, even if a court accepts an agency's interpretation of the regulation, the court must consider whether that interpretation is consistent with the statute under which it is promulgated. *United States v. Larinoff*, 431 U.S. 864, 873 (1977).

## **ANALYSIS**

At issue in this case is the Secretary's interpretation of 42 C.F.R. § 412.105(g)(1), which sets forth the type of resident activities that Medicare will include in its calculation of a teaching hospital's IME FTE resident count. In relevant part, this regulation provides:

> (1) For cost reporting periods beginning on or after July 1, 1991, the count of full-time equivalent residents for the purpose of determining the indirect medical education adjustment is determined as follows:
>
> (i) *The resident must be enrolled in an approved teaching program*. An approved teaching program is one that meets on of the following requirements:
>
> (A) Is approved by one of the national organizations listed in § 415.200(a) of this chapter.
>
> (B) May count towards certification f the participant in a specialty or subspecialty listed in the Directory of Residency Training Programs published by the American Medical Association.
>
> (C) Is approved by the Accreditation Council for Graduate Medical Education (ACGME) as a fellowship program in geriatric medicine….
>
> (ii) In order to be counted, the resident must be assigned to one of the following areas:
>
> (A) *The portion of the hospital subject to the prospective payment system*.
>
> (B) the outpatient department of the hospital….

42 C.F.R. § 412.105(g) (1996) (emphasis added).

Therefore, in order for a resident to be included in Medicare's IME payment, two requirements must be met: (1) the resident must be enrolled in an approved teaching program, and (2) the resident must be assigned to a portion of the hospital subject to the PPS. *Id.* In this case, it is undisputed that the residents were enrolled in an approved teaching program. The only dispute is whether the residents were in a "portion" of the Hospital that is subject to the PPS.

***A. The 2001 Regulatory Amendment***

As a preliminary matter, is noted that the 2001 amendment to the regulation has no bearing on the outcome of this case. The 2001 amendment states that "[t]he time spent by a resident in research that is not associated with the treatment or diagnosis of a particular patient is not countable." 42 C.F.R. § 412.105(f)(1)(iii)(B). According to the Secretary, the amendment was promulgated in order to "reiterate…longstanding policy regarding time that residents spend in research and…to incorporate this policy in the IME regulations." 66 Fed. Reg. 22,646, 22,699 (May 4, 2001). Although the parties dispute whether the amendment actually reflects the Secretary's "longstanding policy," this dispute need not be resolved. Even if the amendment clarifies the 1996 regulation, the amendment adds nothing to the analysis that could not be gleamed form the 1996 regulation itself. On the other hand, if the amendment altered the meaning of the 1996 regulation, such an alteration would not apply retroactively, and therefore, the amendment is irrelevant.

## B. *The Plain Meaning of the 1996 Regulation*

As outlined above, in order for a resident to be included in the Hospital's IME FTE count, the residents must (1) be enrolled in an approved teaching program, and (2) be assigned to a portion of the Hospital that is subject to the PPS. 42 C.F.R. § 412105(g) (1996). The disputed issue before this Court is the proper meaning of "portion." While the Hospital contends that "portion" unambiguously refers to a geographical location within a hospital, the Secretary argues that "portion" unambiguously refers a function that a resident is performing within a hospital, regardless of that resident's physical location.

The Secretary argues that the term "portion" has a functional definition. Specifically, the Secretary contends that a resident involved in educational research, regardless of where the

9

research occurs, should be excluded in the IME FTE resident count. When, however, the same resident performs a service related to patient-care, that resident may be included in the IME FTE resident count. To exemplify the Secretary's position, the Secretary maintains that a resident can remain in the same geographical location and perform an educational research function that would be excluded from the indirect payment, and a few moments later, the same resident in the same location can perform a patient-related function that would be included in the indirect payment. Thus, under the Secretary's interpretation of the regulation, a resident's function, and not the resident's location, determines whether that resident may be included in a hospital's IME FTE resident count.

In support of her position, the Secretary argues that the word "portion" simply refers to a "share" or "a part of any whole, either separated from or integrated with." *Random House Webster's Unabridged Dictionary* 1507 (2d ed. 2001). This definition, in conjunction with the assertion that the PPS pays only for the "operating costs of inpatient hospital services" because the PPS is a derivative of the reasonable cost system, leads the Secretary to believe that the term "portion" refers only to those functions related to inpatient care. (AR at 12.) Furthermore, the Secretary relies upon the First Circuit's holding in *Rhode Island* and argues that two other terms in the regulation—"areas" and "assigned"—are susceptible to "various definitions," and therefore, the regulation is ambiguous. *Rhode Island*, 548 F.3d at 36. As a result, in accordance with the standard of review stated above, the Secretary maintains that her interpretation of the regulation is reasonable, and that this Court cannot supplant its preferred definition for that of the Secretary's.

The Secretary's interpretation of the regulation does not persuade this Court because, as the Hospital correctly contends, the term "portion" unambiguously refers to a geographical location. This geographical definition comports with the Seventh Circuit's decision in *Rush University Medical Center*, 535 F.3d 735 (7th Cir. 2008) [hereinafter *Rush University*]. In *Rush University,* the Court interpreted the same statute at issue in this case and held that hospitals may only collect IME payments after proving the physical location of its residents: "It isn't enough to be assigned to a hospital, or even in the hospital; it is essential to be in an eligible *part* of a hospital. Research areas, outpatient clinics, psychiatry units, and rehabilitation units are excluded." *Id.* (emphasis in original). In defining the term "portion" as a "*part* of a hospital," such as "research areas, outpatient clinics, psychiatry units, and rehabilitation units," which are all geographical terms, the Court in *Rush University* clearly imparted a geographic meaning to the term "portion." Thus, in accordance with *Rush University*, the term "portion" refers to a geographical location, not to a resident's function. Additionally, it is noted that the Seventh Circuit expressed a clear need for bright-line rules in *Rush University*, which would favor the Hospital's position.

Moreover, in order to give clear meaning to each word used in the regulation, the term "portion" must possess a geographical meaning. The regulation states that residents must be included in the IME FTE resident count when the resident is one of two "areas": (1) in a portion of the hospital subject to the PPS, or (2) in the "outpatient department of the hospital." 42 C.F.R. § 412.105(g)(1)(ii) (1995). The term "area" has a geographical meaning because an "outpatient department" clearly denotes a geographic location. Consequently, given that "area" is a geographical term, the term "portion" must also have a geographical meaning. This

11

argument conforms to the common rule of statutory construction, which provides that a word used in the same section of the same enactment must be given the same effect. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 557 (1994) *quoting Dewsnup v. Timm*, 502 U.S. 410, 422 (1992) (Scalia, J., dissenting).

Likewise, as noted by the Hospital, the Secretary's Medicare Intermediary Manual never advised the auditors to investigate a resident's function. Instead, the manual only directed auditors to exclude residents from the FTE resident count when the residents were "in unapproved programs; working at another provider; assigned to excluded units; replacing non-physician anesthetists; or assigned to freestanding clinics such as family practice centers or non-provider clinics." MIM § 4198, Ex. A-10 (AR at 1062-64.) It is emphasized that nothing in this manual requires the auditor to determine whether a resident is performing an acceptable function. Indeed, the Secretary's own auditors followed this manual during an extensive four-year audit that determined the physical *location* of these residents, while completely ignoring the *function* of the residents. If the Secretary had in fact been applying a functional definition in 1996, the Secretary's own fiscal intermediary and auditors would have been aware of a need to investigate a resident's function. Their lack of awareness simply confirms what the plain meaning of the regulation commands: the term "portion" refers to a geographical location, not to a resident's function.

### *C. A Direct Patient Care Requirement Cannot Be Read into the Regulation*

The Secretary argues that a resident's research must directly relate to a patient's care in order for the resident to be included in the Hospital's IME FTE resident count. Although the 1996 regulation does not create a direct patient care requirement on its face, the Secretary

supports her interpretation by arguing that the regulation does not *prohibit* the Secretary from creating a direct patient care requirement. The Hospital, however, contends that the Secretary cannot graft a direct patient care requirement onto the regulation because no such requirement was expressly created by the 1996 regulation. The Hospital bolsters its argument by citing Congress' amendment to the statute under which the 1996 regulation was promulgated. This amendment occurred in 1997, and it created a direct patient care requirement in *non-hospital* settings only. Given that Congress knew how to create a direct patient care requirement, its decision not to create the requirement in *hospital* settings was presumably intentional.

The Hospital's arguments are persuasive. The 1996 regulation expressly limits the indirect payment with two requirements: 1) the resident must be enrolled in an approved teaching hospital, and 2) the resident must be in a portion of the hospital that is subject to the PPS. 42 C.F.R. § 412.105(g) (1995). These are the only two limitations on the indirect payment, and the regulation makes no mention of a direct patient care limitation on research. Thus, the finding of a direct patient care requirement in the 1996 regulation would require this Court to read in language that does not appear either on the face of the regulation or in the manifest intentions of the Secretary at the time of the regulation's promulgation. Moreover, when Congress amended the statute in 1997 to create a direct patient care requirement, Congress was careful to limit this requirement to *non-hospital* settings only. Thus, *expressio unius est exclusio alterius*, it is presumed that Congress' failure to apply this requirement to hospital settings was intentional. Therefore, in accordance with the plain language of the regulation, as well as Congress' intent, this Court does not find a direct patient care requirement in the 1996 regulation. Consequently, the Secretary cannot exclude a resident who engages in educational

research from the Hospital's IME FTE count simply because that research does not directly relate to a patient's care.

### *D. The Statute, 42 U.S.C. § 1395*

This Court's interpretation of the 1996 regulation is dispositive, and therefore, this Court need not address whether the statute requires the Secretary to include a resident's research time into the Hospital's IME FTE count. However, it is noted that this Court's interpretation of the term "portion" is consistent with the statute under which the regulation was promulgated because the statute intends to reimburse teaching hospitals for the costs of indirect medical education, including the cost of residency programs. The Secretary never argues to the contrary.

## **CONCLUSION**

For the foregoing reasons, the Hospital's motion for summary judgment[# 21] is granted and the Secretary's cross-motion for summary judgment [#27] is denied. This case is hereby terminated.

It is so ordered.

_____
Wayne R. Andersen
United States District Court

August 3, 2009